UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
OSAN LIMITED,

                Plaintiff,

                                         05 CV 5048 (SJ)

       -against-                          **MEMORANDUM
                                                AND ORDER**

ACCENTURE LLP, ACCENTURE LTD. T/A,
ACCENTURE eDEMOCRACY SERVICES,
ACCENTURE INC., MEG T. McLAUGHLIN, and
CLIFFORD S. JURY,

                Defendants.
-----------------------------------------------------------------X
A P P E A R A N C E S:

MOHEN & TREACY LLP
186 Birch Hill Road
Locust Valley, NY 11560
By:    Domenick Patrick Leonardi, Esq.
        Thomas P. Mohen, Esq.
Attorneys for Osan Limited

FINKELSTEIN & HORVITZ, P.C.
7315 Wisconsin Avenue
Suite 400 East
Betheseda, MD 20814-3202
By:    Laurie B. Horvitz, Esq.
Attorney for Osan Limited

KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC  20025
By:    Craig C. Primis, Esq.
        John C. O'Quinn, Esq.
        Christopher Posteraro, Esq.
        Joseph Serino, Jr., Esq.
Attorneys for Accenture LLP, Accenture Ltd. t/a

Accenture eDemocracy Services, Accenture Inc.,
Meg. T. McLaughlin, and Clifford S. Jury

JOHNSON, Senior District Judge:

Plaintiff Osan Limited ("Plaintiff"), as majority shareholder and creditor of Election.com ("Election"),[1] brought this action against Defendants Accenture LLP, Accenture, Inc., Accenture Ltd. t/a Accenture eDemocracy Services ("eDemocracy"), Meg T. McLaughlin ("McLaughlin"), and Clifford Jury ("Jury") (collectively, the "Defendants") alleging (1) fraud and misrepresentation, (2) breach of fiduciary duty, (3) civil conspiracy, (4) unjust enrichment, and (5) promissory estoppel. These claims arise from a transaction in which Election sold substantially all of its assets to Accenture LLP. (Compl. ¶ 1.)

Defendants now move to dismiss each of Plaintiff's five causes of action in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rule 12(b)(6) Motion"). Plaintiff also moves to amend its Complaint in order to replead the fraud cause of action and to add a claim for breach of the implied covenant of good faith and fair dealing. For the reasons stated herein, Defendants' motion to dismiss is granted. Plaintiff's motion for leave to amend the Complaint is denied, with respect to the fraud claim, and granted, with respect to the claim for breach of the implied covenant of good faith and fair dealing.

---

[1] Although Election is now known as Votation.com, Compl. ¶ 3, the parties to this action refer to Election by that name in their submissions; therefore, for the sake of consistency, the Court shall also do so throughout this opinion.

## **BACKGROUND**

Because the Court must accept all well-pleaded allegations in the complaint as true when considering the Rule 12(b)(6) Motion, <u>Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.</u>, 32 F.3d 697, 699-700 (2d Cir. 1994), the facts outlined below are based primarily on those provided by Plaintiff.

In 2001, Accenture LLP[2] and Election entered into a business arrangement "to deliver comprehensive voter registration and election management solutions to meet the varying needs of state governments." (Compl. ¶ 16.) In December 2002, Accenture LLP began discussions with Election about purchasing Election's public sector assets. (Compl. ¶ 21.) Jury, an Accenture LLP employee, and McLaughlin, an Accenture LLP partner and chief executive officer of eDemocracy, sent Election an initial proposal that provided for the purchase of certain assets and liabilities for $4 million at closing, and the payment of between $6 million and $8 million in royalty "earn-out."[3] (Compl. ¶¶ 21-22.)

In January 2003, Jury sent to Election a Letter of Intent and Term Sheet, wherein Defendants adjusted the purchase price from $4 million to $3.1 million, with $1.55

---

[2]Accenture Inc. is the managing partner of Accenture LLP. (Compl. ¶ 8.)

[3]"Earn-out," as defined in Section 1.7(a) of the final Asset Purchase Agreement (the "Final APA"), is a cash payment to be made from Accenture LLP to Election if Accenture LLP enters into a definitive license agreement before December 31, 2006, with a new customer, that is, any state or county in the United States that is not a party to a contract acquired through transactions contemplated in the Final APA. The size of the earn-out payment would be determined by the type of agreement entered into between Accenture LLP and these new customers.

million to be delivered at closing, and $1.55 million to be held in escrow, subject to price adjustment provisions.  (Compl. ¶ 23.)  Defendants also provided for "up to $6.25 million in accordance with an earn-out arrangement."  (Compl. ¶ 23.)  In February 2003, Accenture LLP and Jury conducted due diligence on Election and its public sector business.  (Compl. ¶ 25.)  On or about March 11, 2003, Plaintiff, as Election's majority shareholder, approved moving forward with Accenture LLP's acquisition of Election's assets.  (Compl. ¶ 27.)

Later that month, Accenture LLP produced the first draft of an Asset Purchase Agreement (the "March APA Draft"), which provided for (1) a $4 million cash payment, with $2 million to be delivered to Election and $2 million to be placed in escrow subject to conditions contained in an escrow agreement, (2) Accenture LLP's assumption of certain assumed liabilities, as defined in the March APA Draft, and (3) an earn-out payment.  (Compl. ¶ 29.)  The March APA Draft also projected that Election's public sector business would generate cash in the amount of $5 million between approximately May 31, 2003, and August 31, 2003, with an adjustment to the purchase price in the event of a shortfall.  (Compl. ¶ 30.)  The March APA Draft also requested that Plaintiff, as Election's largest creditor, guarantee Election's contractual obligations.  (Compl. ¶¶ 38-39.)

On April 16, 2003, Jury stated that the purchase price should be reduced to reflect Election's accruing cash and accounts receivable from a United Kingdom project.  (Compl. ¶ 33.)  On April 28, 2003, Jury sent a communication stating that the purchase

price should be set at $2 million, proposing that the escrow arrangement be abandoned in favor of a deferred payment arrangement, and setting the Public Sector Revenue Target[4] at $1.75 million.  (Compl. ¶¶ 32, 35.)

On May 7, 2003, the Final APA was executed and stated that Election agreed to the following: (1) Election would receive a deferred cash payment of $2 million and (2) Election's future earn-out payments would have an $8 million ceiling.  (Compl. ¶ 46.)  Additionally, as required by the Final APA, Plaintiff released liens on Election's assets.  (Compl. ¶ 48.)  Plaintiff also executed a limited guaranty in favor of Accenture LLP for certain of Election's Final APA performance obligations.  (Compl. ¶ 44.)  Accenture LLP purchased most of Election's assets on or about June 1, 2003.  (Compl. ¶ 11.)

On or about May 31, 2003, when the first deferred payment was due from Accenture LLP to Election pursuant to the Final APA, Defendants asserted that Election was not entitled to payment because Election had failed to reach the Public Sector Revenue Target.  (Compl. ¶ 50.)  On December 12, 2003, Defendants maintained that Election was not entitled to payment because of a $1,282,081.00 revenue shortfall and, in light of the shortfall, Election instead owed a cash payment to Defendants.  (Compl. ¶ 51.)

On June 1, 2004, a second payment was due from Accenture LLP to Election, and in July 2004, Accenture LLP paid Election $511,762.01, including $100,000 as an

---

[4]The "Public Sector Revenue Target," as defined in the Final APA, is the level of revenue below which Accenture LLP may demand that Election pay to Accenture LLP an amount equal to the shortfall, or in the alternative, Accenture LLP may offset the shortfall against its second payment to Election.

earn-out payment. (Compl. ¶¶ 55, 57.) Notwithstanding receipt of these funds, Plaintiff alleges that Accenture LLP withheld earn-out fees to which Election was entitled under the Final APA. (Compl. ¶ 58.)

Plaintiff filed the instant action in the United States District Court for the District of Columbia (the "DC Federal Court") on August 2, 2004, alleging that Defendants' wrongful conduct in connection with the sale and purchase of Election's assets entitled Plaintiff to relief. In sum and substance, Plaintiff alleges the following: (1) that it was wrongfully induced into approving the Final APA because of Defendants' misrepresentations regarding the purchase price and the calculations used to determine that price; (2) that Defendants were in a superior bargaining position relative to Plaintiff, and took advantage of Plaintiff as a result; (3) that Defendants conspired to wrongfully induce Plaintiff's consent to the APA and conspired to take advantage of Plaintiff; (4) that Defendants were unjustly enriched by their wrongful conduct; and (5) that, because the bargain between Election and Defendants should be void due to fraud, Plaintiff should be allowed to recover under a theory of promissory estoppel.

On November 23, 2004, Defendants filed in the DC Federal Court a motion to dismiss Plaintiff's Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state claims upon which relief can be granted. On September 30, 2005, after determining that this Court is the proper venue, the DC Federal Court issued an order transferring the case. As a result of the transfer, the Rule 12(b)(6) Motion is now pending before this Court.

## JURISDICTION

This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(a)(1), as the amount in question exceeds $75,000, and opposing parties are not citizens of the same state.

## STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Rule 12(b)(6) should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Green v. Maraio, 722 F.2d 1013, 1015-16 (2d Cir. 1983) (citation omitted). As the Court already noted, it must accept as true all material facts well-pleaded in the complaint and must make all reasonable inferences in the light most favorable to the plaintiff. Jackson Nat'l Life Ins. Co., 32 F.3d at 699-700. Moreover, a district court must limit its consideration to the complaint and any attached exhibits or documents incorporated in the complaint by reference. See Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).[5]

---

[5]The Court also notes that it will apply New York law to this action. Defendants state the following in support of choosing New York law: "Each of the agreements between Accenture LLP, Election, and Plaintiff specifies that it is to be construed in accordance with New York law. For example the APA provides that '[t]his Agreement and all matters relating to this Agreement shall be governed by and construed in accordance with the laws of the State of New York.'" (Defs.' Mem. Supp. Mot. Dismiss, Ex. C (the Final APA) § 10.8.) The Court notes that the limited guaranty agreement (the "Guaranty Agreement"), to which Plaintiff is a party and that incorporates the Final APA by reference, also states that New York law will govern its provisions. (Defs.' Mem. Law Supp. Mot. Dismiss, Ex. D (the Guaranty Agreement) § 9.) In its response, Plaintiff states that it is "not a signatory to the [Final APA], and rightly notes that this case involves tort claims that may not be governed by" the Final APA's choice of law provision because, under New York law, tort claims are generally understood to be outside the scope of contractual choice of law provisions, see Finance One Public Co. Ltd. v. Lehman Bros. Special Financing,

## DISCUSSION

## DEFENDANTS' MOTION TO DISMISS

### I.     Fraudulent Inducement

####     A.     The Legal Standard

In order to properly plead a claim of fraudulent inducement[6] under New York

Law, a defendant must make a knowingly false representation of a material fact and

there must be detrimental reliance thereon.  <u>Wurtsbaugh v. Banc Am. Secs., LLC</u>, No.

05 CV 6220, 2006 U.S. Dist. LEXIS 40473, at *18-19 (S.D.N.Y. June 20, 2006).  The

false representation can be either a misrepresentation or the material omission of a fact.

<u>Id.</u> at 19.  Additionally, a party's reliance on an alleged misrepresentation must be

reasonable.  In assessing whether reliance is reasonable, the entire context of the

transaction is considered, including factors such as its complexity and magnitude, the

sophistication of the parties, and the contents of any agreements between them.  <u>Id.</u>  In

---

<u>Inc.</u>, 414 F.3d 325, 335 (2d Cir. 2005).  (Pl.'s Suppl. Mem. Law Opp'n Mot. Dismiss 4 n. 2.)  Plaintiff
does, however, state that "New York jurisprudence permits Plaintiff's causes of action."  (Pl.'s Suppl.
Mem. Law Opp'n Mot. Dismiss 4 n. 2.)  Notwithstanding this position, Plaintiff does not argue that any
other law should be applied during the Court's disposition of this motion, and cites to New York precedent
throughout its submissions.  In light of these facts, the Court will apply New York law for the throughout
the disposition of the Rule 12(b)(6) Motion.

[6]While the Complaint does not specifically characterize the fraud claim as one of fraudulent
inducement, the crux of Plaintiff's cause of action is that it "[Plaintiff] was fraudulently induced to execute
documents that, according to Defendants, facilitated the sale of Election's public sector assets for a
pittance of the consideration expressly stated to [Plaintiff]."  (Pl.'s Mem. Law Opp'n Mot. Dismiss 2.)
Thus, Plaintiff's fraud claim will be examined under the more specific claim of fraudulent inducement, as
recognized by New York law.

addition to proving the elements of fraudulent inducement, a party bears an additional burden when arguing that it was induced to enter into a contract by way of a misrepresentation. As explained by the United States Court of Appeals for the Second Circuit (the "Second Circuit"), the party must "either (1) demonstrate a legal duty separate from the duty to perform under the contract; (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996). By recognizing that a fraud claim and a contract claim may co-exist in a single action, the test espoused in Bridgestone confirmed that a valid fraud claim may be premised on misrepresentations made before formation of, and that induced the plaintiff to enter into, a contract. Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994). However, and perhaps more importantly, this well-settled test also ensures that contract actions are not improperly converted into fraud actions by mere allegations that a contracting party did not intend to meet its contractual obligations. Reserve Solutions, Inc. v. Vernaglia, No. 05 CV 8622, 2006 U.S. Dist. LEXIS 41430, at *13 (S.D.N.Y. June 20, 2006).

**B.      Plaintiff's Fraudulent Inducement Claim**

Defendants argue that Plaintiff's fraud claim fails as a matter of law because it is merely a breach of contract claim recast as a tort claim and, thus, cannot stand under

New York law.[7]  Plaintiff responds that its claims are not based on an express contract, but rather are "premised upon [D]efendants' repeated misrepresentations regarding the amounts to be paid [to Election] for [its] assets," which ultimately and wrongfully induced Plaintiff into releasing its liens on Election's property.  Pl.'s Suppl. Mem. Law Opp'n Mot. Dismiss 6.  Because Plaintiff contends that Defendants' misrepresentations resulted in the formation of a contract, application of the Bridgestone principles to the instant case is appropriate.

### 1. Misrepresentations that are Collateral or Extraneous to the Contract

Although drafted with language usually reserved for tort claims, the Court finds that Plaintiff's Complaint does not allege any misrepresentations made by Defendants that are collateral or extraneous to the contract at issue, namely, the Final APA.  The face of the Complaint provides the most compelling evidence for this conclusion.  On the basis of its status as an "intended beneficiary" of the Final APA, Compl. ¶ 62, a proposition that the Court will accept as true for the purposes of this motion, Plaintiff

---

[7]Defendants also argue that Plaintiff's fraud claim fails because it was pled with insufficient particularity and, thus, does not comport with Rule 9(b) of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 9(b) ("[I]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").  In applying New York law in diversity actions, courts in the Second Circuit have held that, to satisfy Rule 9(b), the plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  Wurtsbaugh, 2006 U.S. Dist. LEXIS 40473, at *12 (quoting Eternity Global Master Fund Ltd. v. Morgan Guar. Trust, 375 F.3d 168, 187 (2d Cir. 2004)).  Because the Court will dispose of Plaintiff's fraud on the merits, it will not address whether Plaintiff meets the pleading requirements set forth in Rule 9(b).

alleges that "Defendants failed to collect accounts receivable <u>in accordance with the terms of the contract</u>." Compl. ¶ 49 (emphasis added). Plaintiff goes on to state that Defendants "paid less than [25%] of the cash purchase price <u>set forth in the Final APA</u>" and received license fees within the past 12 months that "<u>fall within the scope of the [Final APA's] earn-out provisions</u>." Compl. ¶¶ 57-58 (emphasis added). Thus, Plaintiff contends, "Defendants . . . have an obligation to pay a royalty earn-out," Compl. ¶ 58, and have failed to do so, Compl. ¶ 59. It is clear to this Court that these allegations sound in contract, not the tort of fraud.

Plaintiff's assertion that Defendants disingenuously claimed that no monies were due to Election at the first scheduled deferred payment date, Compl. ¶¶ 50-51, is also predicated on Defendants' alleged unwillingness or inability to comply with the payment calculation and disbursement provisions set forth in the Final APA. <u>See</u> Final APA § 1.6. Similarly, Plaintiff's allegations that "Defendants wrongfully withheld a first Cash Payment, wrongfully reduced a second Cash Payment," "understated earn-out royalties," and "wrongfully [forgave] or failed to collect accounts receivable that, if collected, would have increased the purchase price of the assets" are all premised on the APA. Compl. ¶¶ 85-86. The Court's review of the record before it confirms that each of the obligations that Plaintiff claims was unsatisfied is expressly governed by the terms of the Final APA. <u>See</u> Final APA § 1.6 (detailing, <u>inter alia</u>, the calculation methodology and timing of cash disbursements), § 1.7 (describing, <u>inter alia</u>, the calculation methodology for earn-out payments).

Plaintiff's other statements, including that "Defendants misled Election and Plaintiff with respect to the projected public sector revenue targets in the [Final APA]," Compl. ¶ 71 (emphasis added), and that Plaintiff relied on the "purchase price of two million dollars in contractual documents," Compl. ¶ 70 (emphasis added), do nothing more than confirm that the obligations set forth in the Final APA are those on which Plaintiff based its decision to release its lien on Election's assets.  Given that these obligations are on the face of the Final APA, which at this juncture appears to be an enforceable contract, New York law requires that Plaintiff, as an intended beneficiary,[8] rely on that contract, not an action in tort, to seek relief in the first instance.

In its opposing briefs to the Rule 12(b)(6) Motion, Plaintiff attempts to save its fraud claim by asserting that Defendants' misrepresentations occurred prior to the execution of the Final APA and, thus, a claim for fraudulent inducement is properly raised.  Plaintiff specifically argues that "the misrepresentations involved specific and repeated usage of monetary amounts in multiple communications that were factually incorrect at the time."  Pl.'s Suppl. Mem. Law. Opp'n Mot. Dismiss 4-5.

Plaintiff correctly notes that "[f]raudulent inducement claims and breach of contract claims relate to two different actions by a defendant at two different times." Topps Co. v. Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 264 (S.D.N.Y. 2005) (citations omitted).  Indeed, New York courts clearly distinguish between a "promissory

_____

[8]As an intended beneficiary, Plaintiff is entitled to no greater rights than the actual contracting parties to a contract.  See BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 697 (2d Cir. 1993).

statement as to what will be done in the future," which gives rise only to a breach of contract claim, and a false "representation of present fact," which gives rise to a separable claim of fraudulent inducement.  Id. at 265 (citing Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992)) (other citation omitted).

Plaintiff's argument is, however, belied by the very language of the allegations contained in the Complaint.  Although Plaintiff recounts the documents and statements that took place prior to the execution of the Final APA, Plaintiff states repeatedly that its approval of the transaction was premised expressly upon a purchase price of two million dollars in cash, plus millions of dollars in potential future earn-out.  See, e.g., Compl. ¶¶ 63, 65, 70, 73.  This purchase amount is the same as that presented in the Final APA, and whose calculation is expressly set forth in that same document.  Finally, as previously stated, all other statements upon which Plaintiff purports to have relied were all set forth in the text of the Final APA and related documents.  Thus, Plaintiff's allegations implicate Defendants failure to fulfill future promises and not Plaintiff's reliance upon misrepresentations as to present facts during negotiations, making a tort claim inapposite.[9]  Notwithstanding Plaintiff's assertion to the contrary, there is no

---

[9]Even if Plaintiff did rely on statements made during negotiations regarding the purchase price for Election's assets, such reliance would be unreasonable.  Section 10.7 of the Final APA clearly states, in pertinent part, that it "supersede[s] all prior arrangements or understandings" and that "[t]here are no restrictions, agreements, promises, warranties, covenants, or undertakings other than those expressly set forth" therein.  Thus, the controlling purchase price, and related calculations, for this transaction is that which is embodied in the Final APA, not that which was the subject of negotiations.  Where, as here, a contracting party that is a sophisticated business entity disclaims the existence of or reliance on specified representations, it will not be allowed to claim it entered the contract in reliance thereon.  Aniero Concrete Co. v. New York City Constr. Auth., Nos. 94 CV 9111, 95 CV 3506, 1997 U.S. Dist. LEXIS 22, at *24-25 (S.D.N.Y. Jan. 3, 1997) (also noting that the requirement that a contract's "merger clause" specifically

reason for this Court to find other than what is apparent – that Plaintiff has not alleged any misrepresentations that are collateral or extraneous to the Final APA. Plaintiff's claim, therefore, fails the first part of the <u>Bridgestone</u> test.

        2.      <u>Legal Duty Separate from Duty to Perform under Contract</u>

The next <u>Bridgestone</u> factor ripe for examination permits a fraud claim premised on inducement to survive dismissal when a complaining party demonstrates the existence of a legal duty separate from the duty to perform under the contract. <u>Bridgestone</u>, 98 F.3d at 20. In an effort to show that Defendants owed a duty separate from those contained in the Final APA, Plaintiff asserts that Defendants had a duty to "refrain from providing misleading and erroneous information to [Plaintiff] and its agents prior to [Plaintiff's] release [of its liens] and execution of the Guaranty Agreement and/or to correct such misleading and erroneous misrepresentations." Pl.'s Suppl. Mem. Law Opp'n Mot. Dismiss 5. After reviewing the Complaint and the documents incorporated therein, the Court cannot agree with Plaintiff's assertion.

There is no indication of any legal duty between Plaintiff and Defendants separate from the contracts currently at issue. First, as described more fully <u>infra</u>, parties dealing in an arms-length transaction are not necessarily placed in positions of confidence or trust, that is, of fiduciaries, with respect to other contracting parties,

---

disclaim particular communications is relaxed when the contracting parties are sophisticated business entities, and the clause is the result of negotiations between the parties).

unless extraordinary circumstances indicate (or dictate) otherwise.  See National Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 679 (S.D.N.Y. 1991).  In this case, the Final APA expressly states that the agreement was entered into on an arms-length basis. Final APA § 3.22 ("[The Final APA] was negotiated and entered into by Sellers without collusion with Purchasers, in good faith and from arms-length bargaining positions."). Although it does not contain a similar explicit statement, the Court finds no reason to conclude that the Guaranty Agreement contemplates the establishment of a fiduciary relationship between the contracting parties because the Final APA's limitations, including section 3.22, are incorporated by reference, Guaranty Agreement § 1, and the presumption of the parties' arms-length bargaining positions remains applicable, see National Westminster Bank, U.S.A., 130 B.R. at 679.

Given the absence of any other previously existing fiduciary duties between Plaintiff and Defendants that could possibly extend to the Final APA and related transaction documents, the Court finds that such duties did not exist for this transaction and thus cannot save Plaintiff's fraud claim.

### 3.    Special Damages

The Court now turns to the third and final portion of the Bridgestone analysis, that is, a determination of whether Plaintiff has sought special damages that are caused by Defendants' alleged misrepresentations and are unrecoverable as contract damages. Bridgestone, 98 F.3d at 20.  Special damages, in the context of commercial fraud, arise

in consequence of a breach and seek to compensate a plaintiff for losses other than the diminished value of the promised performance. <u>Bibeault v. Advanced Health Corp.</u>, No. 97 CV 6026, 2002 U.S. Dist. LEXIS 225, at *6 (S.D.N.Y. Jan. 8, 2002) (citing New York cases). The circumstances giving rise to such damages must reasonably be anticipated at the time the contract was made. <u>Id.</u>

The question in this case is whether the damages Plaintiff claims to have suffered, namely, releasing liens against Election's assets as a result of Defendants' misrepresentations, are a special consequence of the alleged fraud and, thus, can be separated from contract damages that could be claimed.

Plaintiff asserts that its demand for compensatory damages (in the amount of $9.5 million) is "a direct result of Defendants' fraud and misrepresentations." Compl. ¶ 88.[10] It is this Court's view that Plaintiff's demand would either be entirely, or almost entirely, unrecoverable under its fraud cause of action because the same damages could be claimed under a breach of contract theory. As noted throughout this opinion, the Final APA and its related agreements contemplated that Plaintiff would release its liens against Election and enter into the Guaranty Agreement. However, the compensatory damages to which Plaintiff alleges it is entitled, an amount apparently based on Plaintiff's view of the fair consideration for the liens formerly held against Election, <u>see</u>

---

[10]Plaintiff also demands $10 million in punitive damages. (Compl. ¶ 88.) Given that punitive damages are not regarded as being caused by reliance on a party's misrepresentations, <u>Excalibur Sys. v. Aerotech World Trade, Ltd.</u>, No. 98 CV 1931, 1999 U.S. Dist. LEXIS 20084, at *8 (E.D.N.Y. Dec. 30, 1999), the Court will focus its analysis on the compensatory damages pled by Defendants.

Pl.'s Suppl. Mem. Law Opp'n Mot. Dismiss 6, reflect the investment it made in accordance with the Final APA and related documents.  Given that Plaintiff released its liens pursuant to contracts Defendants have allegedly failed to honor, any resulting damages are appropriately recovered by Plaintiff under a contract theory, not fraud.  See Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 430 (S.D.N.Y. 2004).

After examining each of the factors provided in Bridgestone, this Court cannot determine that one of Plaintiff's fraudulent inducement allegations can survive under New York law given the existence of the Final APA.  Where, as here, "the essence of Plaintiff's fraud claim is Defendants' alleged non-performance of its duties under the contracts between the parties, the remedy for the infraction alleged by [Plaintiff] is an action in contract."  New York Racing Ass'n, Inc. v. Meganews, Inc., No. 97 CV 1091, 2000 WL 307378, at * 4 (E.D.N.Y. Mar. 21, 2000).

## II.        Breach of Fiduciary Duty

In its second cause of action, Plaintiff alleges that Accenture LLP owed a fiduciary duty to both Election and Plaintiff, based upon the alliance that had been forged between Accenture LLP and Election through "numerous contracts and subcontracts between Accenture LLP and Election . . . ."  Compl. ¶¶ 90-91.  In describing the relationship, Plaintiff asserts that Accenture LLP and Election were "business partners involved in joint ventures" and, by extension, "owed fiduciary duties

to Election and its debtors and shareholders" when negotiations for the Final APA commenced. Compl. ¶ 92. Plaintiff also seems to complain that Accenture LLP breached its alleged fiduciary duties by fraudulently inducing Plaintiff to release liens and consent to the transaction contemplated by the Final APA, and by failing to comply with certain provisions of the Final APA, such as collecting accounts receivable. See Compl. ¶¶ 96-97.

"[The] law [of fiduciary duty] recognizes that there is an imbalance inherent in certain relationships which places one party at a disadvantage in its dealings with the other party." Langford v. Roman Catholic Diocese of Brooklyn, 677 N.Y.S.2d 436, 438 (N.Y. Sup. Ct. 1998), aff'd, 705 N.Y.S.2d 661 (N.Y. App. Div. 2000). "[F]our elements that . . . are essential to the establishment of a fiduciary relationship [are as follows]: (1) [t]he vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself." Id. However, as noted previously, "[w]here parties deal at arms-length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." National Westminster Bank, U.S.A., 130 B.R. at 679. It is thus clear that "a conventional business relationship, without more, does not become a fiduciary relationship by mere allegation." Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 426 (S.D.N.Y. 1992) (quoting Oursler v. Women's Interart Ctr.,

18

Inc., 566 N.Y.S.2d 295, 297 (N.Y. App. Div. 1991)).

Accenture LLP first argues that Plaintiff does not have standing to bring an action against Accenture LLP for breach of fiduciary duty. Accenture LLP contends that the assertion of a fiduciary relationship between Accenture LLP and Election "borders on specious," but the extension of any alleged fiduciary duties to Plaintiff, because of its status as Election's creditor and majority shareholder, reaches outside the law.

The Court agrees that, although creative, the argument that Accenture LLP owed Plaintiff a fiduciary duty "by extension" is simply untenable. As a matter of law, a shareholder, such as Plaintiff, must bring a derivative action to sue a party for a breach of fiduciary duties to a corporation, because such a claim pleads a wrong against the corporation, not against the individual shareholder. See, e.g., Friedman v. Mohasco Corp., 929 F.2d 77, 79 (2d Cir. 1991) (holding that breach of fiduciary obligations claims "could only be asserted derivatively on behalf of the corporation); Hahn v. Stewart, 73 N.Y.S.2d 297, 297 (N.Y. App. Div. 2004).

Even accepting as true the allegation that there is a fiduciary relationship between Accenture LLP and Election, Plaintiff did not properly bring a derivative action on behalf of Election for breach of fiduciary duty against Accenture LLP. Rather, Plaintiff simply argued, in this direct action, for an extension of Accenture LLP's alleged duty to Election for its own relief, an argument that is unsupported by precedent. Plaintiff has not shown the existence of a fiduciary relationship between itself and

Accenture LLP; therefore, Plaintiff's claim for breach of fiduciary duty cannot be sustained.

## III.  Civil Conspiracy

Plaintiff also brings a claim of civil conspiracy against Defendants.  Under New York law, the "pleading of a conspiracy may be made only to connect the actions of the individual defendants with an actionable injury and to establish that these acts flow from a common scheme or plan."  Smukler v. 12 Lofts Realty, Inc., 548 N.Y.S.2d 437, 439 (N.Y. App. Div. 1989).  Thus, In order to bring a claim for civil conspiracy, Plaintiff "must plead specific wrongful acts constituting an independent tort."  East Coast Novelty Co. v. City of New York, 842 F. Supp. 117, 122 (S.D.N.Y. 1994); see also Linden v. Lloyd's Planning Service, Inc., 750 N.Y.S.2d 20, 21 (N.Y. App. Div. 2002).

In the instant case, the Court has dismissed Plaintiff's claims for fraudulent inducement and breach of fiduciary duty, leaving it with no maintainable underlying tort claim.  Therefore, Plaintiff's civil conspiracy claim must also be dismissed.

## IV.  Unjust Enrichment

Plaintiff filed a cause of action for unjust enrichment, alleging that Defendants "refused to pay adequate compensation for [Election's] assets."  (Compl. ¶ 112.)  However, Defendants argue that where, as here, there is an express contract between the parties, "a cause of action . . . based on the doctrine of unjust enrichment must . . . be

dismissed on the ground that it arises out of the same subject matter covered by the agreement." Neos v. Lacey, 770 N.Y.S.2d 410, 412 (N.Y. App. Div. 2003); see also Julian J. Studley, Inc. v. New York News, 512 N.E.2d 300 (N.Y. 1987). Defendants further argue that a claim made by a third-party beneficiary, such as Plaintiff, "alleging unjust enrichment may not be maintained where there is a valid and express agreement between the parties which explicitly covers the same specific subject matter for which the implied agreement is sought." Kohn v. Hartstein & Hartstein, 742 N.Y.S.2d 879 (N.Y. App. Div. 2002) (citation omitted).

In sum and substance, Plaintiff's claim of unjust enrichment is premised on Defendants' failure to comply with the terms of the Final APA; therefore, a claim of unjust enrichment cannot be maintained. While Plaintiff argues that an unjust enrichment claim is permitted when the validity of a contract is at issue, questions regarding contract validity have been examined by this Court in the form of Plaintiff's fraud claim, insofar as Plaintiff's claim challenges statements that relate to and appear in the Final APA and were made by Defendants, and have been dismissed. Because there is no current question regarding the validity of the contract between the parties to this action, New York law requires that Plaintiff's claim of unjust enrichment be dismissed.

V.      Promissory Estoppel

Plaintiff's final claim is based on a theory of promissory estoppel. Plaintiff alleges that (1) "Accenture LLP made clear and definite oral and written promises

21

relating to payment of earn-out on certain public sector businesses"; (2) "Accenture LLP intended to induce reliance and/or forbearance by Plaintiff upon such promises"; (3) such promises were reasonably relied upon by Plaintiff, to its detriment; and (4) "Accenture LLP's actions have caused a detriment to Plaintiff which can only be avoided by enforcement of the promises."  (Compl. ¶¶ 118-120, 126-127.)

In New York, promissory estoppel is "applicable only in the absence of an enforceable contract."  Holmes v. Lorch, 329 F. Supp. 2d 516, 527 (S.D.N.Y. 2004) (citation omitted).  Additionally, "[p]romissory estoppel may be invoked in two situations: 1) to allow for the enforcement of a promise in the absence of bargained-for consideration; and 2) to contravene the effect of the Statute of Frauds."  Id. (citing Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 824 (2d Cir. 1994).

In an attempt to save its promissory estoppel claim, Plaintiff has alleged that the Final APA is unenforceable because of Defendants' fraud and, thus, an action in equity may lie.  However, the Court has dismissed Plaintiff's fraud claim and rejected Plaintiff's proposed amendments to that claim, as discussed infra.  Therefore, Plaintiff's promissory estoppel claim must fail.

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND

### I.      The Legal Standard

Generally, leave to amend a complaint should be freely given.  Fed. R. Civ. P. 15(a).

22

A motion to amend should be denied, however, "if there is an 'apparent or declared reason -- such as undue delay, bad faith or dilatory motive . . ., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.'" Twisted Records, Inc. v. Rauhofer, No. 03 CV 2644, 2005 U.S. Dist. LEXIS 3313, at *16 (S.D.N.Y. Mar. 3, 2005) (citing Dluhos v. Floating and Abandoned Vessel Known as "New York," 162 F.3d 63, 69 (2d Cir. 1998)).

 Plaintiff seeks leave to amend its complaint by repleading its fraud claim to include ten particulars. Plaintiff also requests leave to amend its complaint to include a claim that Defendants breached the duty of good faith and fair dealing. Here, Defendants have not argued that Plaintiff's proposed amendments will result in undue delay, or that they are the product of a dilatory motive. Therefore, the Court will focus its analysis on whether Plaintiff's proposed amendments would be futile, a determination which must be made under the same standards that govern Rule 12(b)(6) motions. Nettis v. Levitt, 241 F.3d 186, 194 n. 4 (2d Cir. 2001). The operative question thus becomes whether the proposed amendments will allow Plaintiff to state a claim upon which relief can be granted.

## II.  Leave to Amend the Fraud Claim

 Notwithstanding Plaintiff's submission of detailed particulars, the Court must deny Plaintiff's motion to amend its complaint by repleading its fraud claim, as any amendment would be futile. The Court has reviewed each of the ten particulars Plaintiff

proposes to include in an amended complaint, and concludes that each of the particulars

fails to support a claim for fraud under New York law.

The first particular provides that Jury and "Skip Davis of Accenture" never

intended to pay more than five million dollars for Election's assets, despite the terms of

the Final APA.  Pl.'s Suppl. Mem. Law Opp'n Mot. Dismiss 8-9.  Plaintiff also alleges

that Defendants admitted this scheme during an October 2003 meeting held at Accenture

LLP.  Presumably, Plaintiff submits this information to show Defendants' intent to

fraudulently induce Plaintiff to enter into the Guaranty Agreement and release its liens

against Election's assets, as contemplated by the Final APA.  Id.  However, assuming

that Plaintiff's allegations are true, Defendants' allegedly fraudulent statements are most

fairly construed as an indication of Defendants' intent to perform (or not to perform)

under the Final APA and its related documents.  This particular is, therefore, insufficient

to support a fraud claim under New York law, because a claim sounds in contract, not

fraud, "if the only interest at stake is that of holding the defendant to a promise."  Bear,

Stearns Funding, Inc. v. Interface Group – Nev., Inc., 361 F. Supp. 2d 283, 310

(S.D.N.Y. 2005) (citation omitted).

The second particular describes a marketing alliance and financial agreement

between Election and Accenture LLP, under which Accenture LLP had access to

Election's quarterly financial information."  Pl.'s Suppl. Mem. Opp'n Mot. Dismiss 8.

Plaintiff also characterizes the relationship between Election and Accenture LLP as

"trusting and collaborative."  Pl.'s Suppl. Mem. Opp'n Mot. Dismiss 8.  This new

allegation seems to suggest either that Accenture LLP had greater knowledge of Election's financials than Plaintiff or that Accenture LLP had a fiduciary duty to Plaintiff. As previously discussed, the Court finds neither of these suggestions or claims to be tenable. The mere existence of a prior business relationship between Election and Accenture LLP, a fact not in dispute, does not compel this Court to change the following conclusions: (1) Plaintiff, as a shareholder, had access to the same corporate information regarding Election as Accenture LLP; (2) there is no evidence of a fiduciary duty, or other legal duties besides those reflecting in the Final APA, between Plaintiff and Defendants because an arms-length transaction does not create a fiduciary relationship between parties, <u>Greenberg v. Chrust</u>, 198 F. Supp. 2d 578, 585 (S.D.N.Y. 2002); and (3) in any event, any putative fiduciary duty between Accenture LLP and Election does not extend to Plaintiff.

The third and fourth particulars allege that, since the Final APA was executed, Accenture LLP and other defendants have either deceptively structured state contracts or concealed such contracts in order to minimize earn-out payments. Again, this new allegation demonstrates Defendants' alleged failure to comport with the terms of the Final APA and, thus, does not support a fraud claim.

The fifth particular states that Accenture LLP intentionally mislabeled or bundled license fees for Accenture LLP services into other fees for the purposes of reducing exposure to earn-out payments due under the Final APA. Similar to the particulars previously discussed, this proposed amendment implicates Defendants'

compliance (or lack thereof) with the provisions of the Final APA, which is most appropriately brought under a contract action, not a fraud action.

The sixth, seventh, and eighth particulars describe the role of McLaughlin in various contracts between state users, presumably users of Election's technology, and Accenture LLP. Unfortunately, Plaintiff does not make clear the value of such amendments, and the Court can discern none. Therefore, the Court concludes that the proposed additions would not resolve the infirmities of Plaintiff's fraud claim.

The ninth and tenth particulars fare no better than the others. In the ninth particular, Plaintiff states that Accenture LLP had access to monthly information regarding certain of Election's revenues. The tenth particular provides that, during February 2001, "Election issued 100,000 shares of common stock to Accenture Technology N.V." Pl.'s Suppl. Mem. Law Opp'n Mot. Dismiss 9. The Court finds that both of these amendments would be futile. First, the allegation contained in the ninth particular does nothing more than reiterate what is already set out in the Complaint, namely, that the pre-existing business relationship between Accenture LLP and Election gave Accenture LLP access to confidential information regarding Election's business. This new allegation, like the ones set forth in the Complaint, cannot salvage Plaintiff's fraud claim.

Second, assuming that the tenth particular is true, the Court still finds that the proposed amendment would not enable Plaintiff's fraud claim to survive. The Court could construe this particular as an attempt to show that Plaintiff and Defendants are co-

26

shareholders, New York law does not compel a finding of a fiduciary relationship between the parties based on that alleged relationship alone. New York courts have held that no trust relation ordinarily exists between stockholders. <u>Sager Spuck Statewide Supply Co. v. Meyer</u>, 273 A.D.2d 745, 747-748 (N.Y. App. Div. 2000) (citation omitted). In some cases, however, stockholders who dominate and control a corporation have been deemed to occupy a position of partial trust and, thus, may be held accountable in equity for detriment to the corporation caused by their breach of the fiduciary obligation arising from that relationship. <u>Id.</u> (citation omitted). Courts have also recognized the existence of a fiduciary duty between the shareholders of a close corporation, a duty based upon the theory that the relationship between such shareholders is akin to that between partners. <u>Id.</u> (citations omitted).

By alleging that it is Election's largest shareholder, Plaintiff necessarily undermines any putative argument that Defendants have a sufficiently large equity stake by which to dominate and control Election; therefore, a finding of a fiduciary duty on that basis would be unwarranted. Moreover, Plaintiff has not alleged that Election is a close corporation where each shareholder owes a duty to the others. Thus, the Court cannot find that the parties' positions as co-shareholders give rise to a legal duty separate from those enumerated in the Final APA and related agreements. This allegation demonstrates, at best, the existence of a fiduciary relationship between Election, as a corporation, to Accenture LLP, as a shareholder. However, as discussed <u>supra</u>, any alleged fiduciary relationship between Election and Accenture LLP does not

impute to Plaintiff.

Given that none of Plaintiff's ten particulars can save Plaintiff's fraud claim, the Court finds that the proposed amendments are futile. Therefore, leave to amend must be denied.

### III.    Leave to Amend the Complaint to Include a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff also requests leave to amend his complaint to include a claim for breach of the implied covenant of good faith and fair dealing. Pl.'s Suppl. Mem. Law Opp'n Defs.' Mot. Dismiss 9 n. 3. For a complaint to state a cause of action alleging breach of this implied covenant, New York law requires a plaintiff to allege facts tending to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff. Ruderman v. Stern, 6 Misc. 3d 1015A, 800 N.Y.S.2d 356, 2004 N.Y. Misc. LEXIS 2961, at *10-11 (N.Y. Sup. Ct. 2004).

Based on the facts contained in Plaintiff's Complaint, the Court cannot determine that a claim based on the breach of this implied covenant would be futile. The Court therefore grants, in an exercise of its discretion, Plaintiff's request for leave to amend its complaint to include a claim that Defendants breached the implied covenant of good faith and fair dealing.

### CONCLUSION

For the reasons stated herein, Defendants' Rule 12(b)(6) Motion is hereby GRANTED, with respect to Plaintiff's claims for fraud, breach of fiduciary duty, civil conspiracy, unjust enrichment, and promissory estoppel. These claims are therefore DISMISSED with prejudice.

Plaintiff's request for leave to amend its fraud claim is hereby DENIED. Plaintiff's request for leave to amend the Complaint to include a claim for breach of the implied covenant of good faith and fair dealing is hereby GRANTED. Plaintiff shall notify the Court and all parties to this action of its intent to amend the Complaint within sixty (60) days of the date of entry of this order. If no such notice is given, the Court will dismiss this action in its entirety.

SO ORDERED.

Dated: September 18, 2006                    _____/s/_____
       Brooklyn, New York                              Senior U.S.D.J.